USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/30/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ERIN FITCHETT,

                                        Plaintiff,

                    -v-

THE CITY OF NEW YORK, NEW YORK CITY POLICE
DEPARTMENT ("NYPD"), CHIEF OF NYPD
INTELLIGENCE BUREAU THOMAS GALATI, NYPD
COMMANDING OFFICER HOWARD REDMOND, NYPD
LIEUTENANT KARL PFEFFER, and NYPD SERGEANT
PAUL BRISCOE,

                                        Defendants.

---

18 Civ. 8144 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Erin Fitchett, a Detective Third Grade in the New York City Police Department ("NYPD"), brings race-based disparate treatment and hostile work environment claims under Title VII, 42 U.S.C. §§ 2000e, *et seq.*, the New York State Human Rights Law, N.Y. Exec. L. §§ 290, *et seq.* (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL"), N.Y. City Admin. Code §§ 8-101, *et seq.* (together, the "Human Rights Laws"), against defendants the City of New York, the NYPD, and individual defendants Thomas Galati, Chief of the NYPD Intelligence Bureau ("Chief Galati"); Howard Redmond, a NYPD Commanding Officer ("Insp. Redmond"); Karl Pfeffer, a NYPD Lieutenant ("Lt. Pfeffer"); and Paul Briscoe, a NYPD Sergeant ("Sgt. Briscoe").

Fitchett, an African American man, alleges that, despite his exemplary job performance, he suffered ongoing discrimination on the basis of his race, namely, that he was repeatedly denied promotions, given inferior work assignments, denied training and travel opportunities, denied certain breaks and schedule changes, and made to endure the discriminatory comments

1

and conduct of his supervisors. Claiming that this resulted in a hostile work environment and

constituted unlawful employment discrimination, Fitchett seeks compensatory damages and

reasonable attorneys' fees.

Defendants now move to dismiss Fitchett's claims pursuant to Federal Rule of Civil

Procedure 12(b)(6). They argue that some of his claims are time-barred, that he failed to exhaust

his administrative remedies, and that defendants have no individual liability under Title VII.

They also argue that the actions complained of by Fitchett do not constitute adverse employment

actions and that Fitchett fails to demonstrate that such actions were motivated by racial animus.

For the reasons that follow, the Court grants defendants' motion to dismiss Fitchett's

hostile work environment claims and his claims against Lt. Pfeffer and the NYPD. The Court,

however, denies the motion to dismiss the remaining claims.

## I.    Background

### A.    Factual Background[1]

#### 1.    Employment History

Fitchett, an African American man, SAC ¶ 13, has been employed by the NYPD since

July 2005, when he was accepted into the Police Academy, *id.* ¶ 40. Throughout his tenure, he

has received consistently high performance ratings (4.0 or 4.5 out of 5). *Id.* ¶ 41. He has never

had disciplinary charges or proceedings brought against him. *Id.* Since 2014, Fitchett has been a

member of the NYPD's Intelligence Bureau, serving in the Executive Protection Unit ("EPU")

until December 2018. *Id.* ¶¶ 47, 95. In his work at the EPU, Fitchett served as the personal

bodyguard for the Mayor's daughter for approximately two years; the personal bodyguard for the

---

[1] The following account is drawn from Fitchett's Second Amended Complaint. Dkt. 41 ("SAC"). For purposes of resolving a motion to dismiss, the Court accepts as true all factual allegations in the SAC, drawing all reasonable inferences in plaintiff's favor. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

Mayor's son for approximately one and a half years; and as a member of the Mayor's Detail since 2017. *Id.* ¶ 48.

On March 27, 2018, Fitchett filed a charge with the EEOC, requesting that they investigate the matter "as a systemic pattern and practice case." *Id.* ¶ 3. On July 27, 2018, the EEOC issued a Right to Sue letter, permitting Fitchett to file suit against defendants within 90 days. *Id.* ¶ 4; *see also* SAC Ex. 1 (Right to Sue Letter) at 1. On or about December 20, 2018, after this case was filed, Fitchett was transferred to the Dignitary Protection Bureau and assigned to Congressman Jerrold Nadler. SAC ¶¶ 8, 95.

## 2. Promotion Within the NYPD Intelligence Bureau

According to Fitchett, the NYPD has no structured policy or procedure governing the promotion process in the Intelligence Bureau. *Id.* ¶ 77. The NYPD does not reveal when promotion decisions for the Intelligence Bureau will be made, who participates in those decisions, or what weight, if any, the recommendations of supervisors may have. *Id.* ¶ 79. Independent of the promotion process, supervising officers conduct written evaluations of the detectives they supervise, ranking them on various criteria on a scale of 0 to 5. *Id.* ¶ 84. Supervising officers can recommend that a detective be promoted, but Chief Galati is the ultimate decisionmaker for promotion decisions. *Id.* ¶ 77. Beyond evaluations, however, "[c]andidates for promotion are not told how many vacancies there are, who else they are competing against, or what criteria will be used to decide promotions. Often, they are not even informed that they are being considered for promotion." *Id.* ¶ 80. Once a month, Fitchett claims, a ceremony is held to recognize the recipients of new promotions. *Id.* ¶ 83.

Citing an EEOC investigation of the NYPD's Intelligence Bureau, Fitchett claims that the Bureau's structure has been found to be biased against black detectives. According to Fitchett, on March 4, 2016, the EEOC issued a determination regarding racial discrimination charges filed

3

by three other African American detectives in the Intelligence Bureau. *Id.* ¶ 87. The EEOC

determination stated: "[F]urther analysis supports the conclusion that black detectives do not

receive equal treatment in promotion. About 40 became Detective 3s in 2007; of these, 16 have

been promoted to Detective 2 to date. Half the whites have been promoted but only one of the

four blacks has risen to Detective 2." *Id.* ¶ 88. The EEOC determination further stated:

> [I]t is clear that [the NYPD's] defense, that the promotion system is fair and inclusive and that any shortfall in the black participation rate is attributable to unspecified individual circumstances, does not withstand scrutiny. In fact, [the NYPD's] wholly subjective and secret process operates without any structured guidelines. Detailed analysis of the materials made available substantiates the conclusion that the three Charging Parties, and black detectives in general, received lesser and later opportunities for promotion consistent with their qualifications.

*Id.* ¶ 89. Fitchett contends that these findings are relevant to understanding the allegedly

ongoing discriminatory promotion practices and workplace harassment upon which he seeks

relief. *Id.* ¶ 94.

By gaining experience conducting investigative work, police officers, who make up the

lowest uniform rank in the NYPD, may be promoted to Detective Third Grade. *See id.* ¶¶ 27–28.

Upon promotion, detectives receive additional training opportunities, more coveted assignments,

and a substantial increase in pay. *Id.* ¶ 29. Third Grade Detectives are then eligible for

promotion to Second Grade Detective, and then, ultimately, to First Grade Detective. *Id.* ¶ 30.

Fitchett alleges that, although promotions from uniformed police officer to Detective

Third Grade typically take 18 months in his unit, he was not promoted until January 2017, some

27 or 28 months after he joined the EPU. *Id.* ¶¶ 43–44, 90. During that time, according to

Fitchett, non-African American EPU officers with less time in rank, less experience, and less

exemplary performance records were promoted, and at least three non-African American officers

were promoted to Detective Third Grade within 18 months. *Id.* ¶¶ 60, 84, 90. Fitchett's eventual

promotion, he alleges, was granted only after he filed a union grievance, on an unspecified date, after which the NYPD backdated his promotion to December 25, 2015. *Id.* ¶¶ 43, 45. Since his promotion to Detective Third Grade in January 2017, Fitchett has not been promoted. A promotion to Detective Second Grade, Fitchett notes, entails a significant increase in compensation and prestige and entitles the recipient to enhanced retirement benefits. *Id.* ¶ 31. During his tenure as a member of the EPU, at least two EPU detectives, but no African American detectives, have been promoted to Detective First Grade. *Id.* ¶ 91.

### 3. Work Assignments

After Sgt. Briscoe's appointment to the EPU as Fitchett's direct supervisor in the Mayor's detail, Fitchett was increasingly assigned to "invisible and superfluous jobs." *Id.* ¶ 50. For example, Sgt. Briscoe, on several occasions, assigned Fitchett to stand by the front gate of Gracie Mansion in a suit and tie for 17 hours in 20-degree weather. *Id.* ¶ 51. Sgt. Briscoe also regularly assigned Fitchett to the back booth of Gracie Mansion, where uniformed officers were already stationed, for 17-hour shifts, during which Fitchett was only given a single, one-hour meal break. *Id.* ¶¶ 52, 54, 56. According to Fitchett, no non-African American EPU detectives regularly received such assignments or were made to work 17 hours without a two-and-a-half-hour break. *Id.* ¶¶ 53, 55, 57. When confronted by Fitchett, Sgt. Briscoe explained that Fitchett was receiving these assignments because he was "an extra person," and that every member of the Detail would cycle through these assignments. *Id.* ¶ 58. Fitchett alleges, however, that he received 90% of these assignments on his team. *Id.*

On October 11, 2017, Fitchett was stationed at the back booth of City Hall and was denied any break. *Id.* ¶ 62. When he spoke to Insp. Redmond about the assignments he was receiving, Redmond told Fitchett that he "would take care of it." *Id.* However, Fitchett continued to receive such assignments and was not rotated out. *Id.* On October 14 and 15, 2017,

Fitchett was ordered to work overtime; when he asked to switch shifts with another detective, due to a personal commitment—a common occurrence among the detectives on Fitchett's team—Sgt. Briscoe denied his request, responding that he "didn't care." *Id.* ¶ 63. As a result, Fitchett had to ask Insp. Redmond, who permitted him to switch overtime shifts with another detective on the team. *Id.* A month or two after this incident, Sgt. Briscoe again assigned Fitchett to work overtime at the gate of Gracie Mansion in 20-degree weather. *Id.* ¶ 64.

Fitchett also identifies a number of training and travel opportunities that he was never afforded. Unlike 20 out of the 30 detectives in his unit, Fitchett was not offered, and did not receive, training in an FBI driving course. *Id.* ¶ 71. He was never permitted to travel out-of-state with the Mayor's Detail, nationally or internationally. *Id.* ¶ 70. Fitchett's lack of access to these opportunities harmed his professional growth and inhibited his prospects for receiving a promotion. *Id.* ¶ 72.

### 4. Work Environment

Fitchett claims that the collective impact of numerous offensive, derogatory, and discriminatory workplace incidents has caused him "stress and humiliation, and embarrassment to which his non-African American EPU detective counterparts (who also were not members of protected categories) were not subjected." *Id.* ¶¶ 73–74. First, Sgt. Briscoe required Fitchett, unlike other EPU detectives, to check in at Sgt. Briscoe's desk before every shift. *Id.* ¶ 66. On one occasion, Sgt. Briscoe scolded Fitchett for going out to eat with another member of his team after arriving early for his shift, even though Sgt. Briscoe had not arrived yet. *Id.* Sgt. Briscoe allegedly told Fitchett, "I don't want you leaving without checking in," and ordered him to work at the back booth of Gracie Mansion that night. *Id.* Fitchett further alleges that Sgt. Briscoe monitored his whereabouts more than that of other detectives, even telling Fitchett, "If you have to go to the bathroom, you have to check in with me first. I'm the boss." *Id.* ¶ 67. Fitchett also

describes an email from Insp. Redmond to the rest of the EPU, mocking him. It stated, in relevant part: "Fitchett as the 5 minute Auto—hope he can handle it," to which Insp. Redmond later replied, "Just joking Erin—stay in front of the motorcade!" *Id.* ¶ 69.

### 5.    Events Occurring after Fitchett Brought This Action

On or about December 20, 2018, after Fitchett brought this action, he was transferred to the Dignitary Protection Unit ("DPU") and assigned to Representative Nadler. *Id.* ¶ 95. On or about the same date, two other EPU detectives and one Lieutenant Commander—Detective Keith Dietrich, Detective Abdelim Azab, and Lieutenant Commander Francisco Rosado—were also transferred out of the EPU after they had filed EEOC charges, received a Right to Sue Letter from the EEOC, and filed lawsuits alleging workplace discrimination. *Id.* ¶ 100.[2] These individuals, including Fitchett, were each told by the NYPD Deputy Commissioner of Intelligence that their new assignments were unrelated to their job performance, which had been entirely satisfactory. *Id.* ¶¶ 96, 101.

Fitchett asserts that his transfer to the DPU has sent him to the back of the line for promotions, in that he is now in a unit where he lacks seniority and therefore has lower in-unit priority for promotion. *Id.* ¶ 97. According to Fitchett, Azab, Dietrich, and Rosado are the only non-African American detectives or lieutenant-grade and above NYPD personnel that have ever been transferred out of the EPU. *Id.* ¶ 106.

### B.    Procedural History

On September 6, 2018, Fitchett filed the Complaint. Dkt. 1. On November 15, 2018, defendants filed a motion to dismiss. Dkts. 23–25. On December 6, 2018, Fitchett filed an Amended Complaint. Dkt. 28 ("AC"). On December 19, 2018, defendants filed a motion to

---

[2] These EEOC charges were brought on the basis of religion and national origin (Azab), age (Dietrich), and national origin (Rosado), respectively. *Id.* ¶ 35.

dismiss the AC. Dkts. 29–31. On January 10, 2019, the Court held an initial conference. *See* Dkt. 36. On January 22, 2019, Fitchett filed a memorandum of law in opposition to defendants' motion to dismiss and in support of Fitchett's motion for leave to amend the AC, Dkt. 38, accompanied by the declaration of Marshall B. Bellovin, Esq., Dkt. 37. On January 29, 2019, the Court granted Fitchett's motion for leave to amend his Complaint. Dkt. 40.

On February 8, 2019, Fitchett filed the SAC. Dkt. 41. On March 5, 2019, defendants filed their motion to dismiss the SAC, Dkt. 42, a memorandum of law in support, Dkt. 43 ("Def. Mem."), and a declaration by Dominique F. Saint-Fort, Esq., Dkt. 44 ("Saint-Fort Decl."), with an exhibit. On March 18, 2019, Fitchett filed a memorandum of law in opposition, Dkt. 46 ("Pl. Mem."), and an accompanying declaration by Marshall B. Bellovin, Esq., Dkt. 45, with an exhibit. On March 26, 2019, defendants filed their reply. Dkt. 47 ("Def. Reply").

## II.    Legal Standards on a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

In considering a motion to dismiss, a district court must accept as true all well-pled factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor. *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014). However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

"[R]ather, the complaint's *factual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*). A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. Discussion

Defendants argue that the SAC's claims are both procedurally barred and fail to support Fitchett's claims for relief. Procedurally, defendants argue that all claims are partially time-barred and that Fitchett failed to exhaust his administrative remedies. Def. Mem. at 8–10. Substantively, defendants argue that the SAC fails to plead a disparate impact claim because it does not plead any adverse employment action or any action motivated by racial animus. *Id.* at 11–20. Defendants further argue, with respect to the hostile work environment claims, that the SAC does not sufficiently plead a hostile or abusive workplace environment on account of race. *Id.* at 20–23. Finally, defendants argue that they have no individual liability under Title VII, that the SAC fails to make any specific allegations against defendant Lt. Pfeffer, and that the NYPD is not a suable entity. *Id.* at 10–11. The Court considers each set of arguments in turn.

### A. Statutes of Limitation and Exhaustion

#### 1. Statutes of Limitation

Fitchett brings a disparate treatment claim and a hostile work environment claim against the City of New York under Title VII,[3] claims which defendants argue are partially time-barred.

---

[3] To the extent that Fitchett seeks to bring Title VII claims against individual defendants, defendants' motion to dismiss is granted. *See Moultrie v. VIP Health Care Servs.*, No. 08–CV–0457 (DLI) (RML), 2010 WL 1037693, at *1 (E.D.N.Y. Mar. 17, 2010) ("It is well-settled that

Under Title VII of the Civil Rights Act of 1964, plaintiffs must file a complaint with the EEOC within 300 days of the alleged discriminatory act. *See* 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *Tewksbury v. Ottawa Newspapers*, 192 F.3d 322, 327 (2d Cir. 1999). Fitchett filed his EEOC charge on March 27, 2018. Defendants therefore argue that "any alleged discriminatory acts occurring before May 31, 2017, are time-barred." Def. Mem. at 8. On this argument, Fitchett's allegedly delayed promotion to Detective Third Grade in January 2017 would fall outside the 300-day period. Fitchett counters that he has alleged a continuous pattern of failing to promote him, such that acts and omissions predating May 31, 2017, including his lack of a promotion before then, are timely as components of a unitary claim.

Fitchett likewise brings, under the Human Rights Laws, claims of disparate treatment on the basis of race, hostile work environment, failure to promote, and unlawful discrimination. Similar to their claim of untimeliness with respect to the Title VII claims, defendants argue, given the three-year statute of limitations for both NYSHRL and NYCHRL, that any claims accruing before September 6, 2015 are time-barred and must be dismissed. *See* N.Y. C.P.L.R. § 214(2); N.Y. City Admin. Code § 8-502 [d]; *see also Williams v. City of Yonkers*, 76 N.Y.S.3d 92, 93 (2d Dep't 2018). They further argue that, because Fitchett's claims about events before September 6, 2015 are too disconnected from his claims about discriminatory treatment arising after Sgt. Briscoe's appointment as Fitchett's EPU supervisor in 2017, the continuing violation doctrine should not salvage those claims. Def. Reply at 3–4.

---

there is no individual liability under Title VII."); *see also Patterson v. Cty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004).

The Court considers these arguments together, because the continuous violation doctrine at issue is available under and common to all the causes at action at issue and because the elements of the underlying Title VII, and state and city human rights, claims are, in relevant respects, coterminous. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n.1 (2d Cir. 2000) ("Our consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims."); *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n. 1 (2d Cir. 1999) ("Because New York courts require the same standard of proof for claims brought under the NYHRL as for those brought under Title VII, we analyze these claims in tandem.").

Under Title VII, "a claim generally accrues once the plaintiff knows or has reason to know of the injury which is the basis of his action," but the continuing violation doctrine supplies an exception. *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) (internal quotation marks and citations omitted). "When a plaintiff experiences a continuous practice and policy of discrimination . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Id.* (internal quotation marks and citations omitted). "The policy need not be 'formal' or 'widespread,' but the employer must permit the conduct 'to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination.'" *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 301 (S.D.N.Y. 2009) (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 362 (2d Cir. 2001)). In contrast, where there is no continuous practice or policy, "the statute precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," *Morgan*, 536 U.S. at 105, and "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act," *id.* at 113.

Similarly, the Human Rights Laws are subject to the continuing violation doctrine. *See*

*Jeudy v. City of New York*, 37 N.Y.S.3d 498, 500 (1st Dep't 2016) ("Plaintiff's claims for failure

to promote under the City HRL were also improperly dismissed because plaintiff has adequately

alleged a single continuing pattern of unlawful conduct [starting from his first promotion

rejection in 2007] extending into the [limitations] period immediately preceding the filing of the

complaint." (internal citations and quotation marks omitted)); *Ferraro v. New York City Dept. of

Educ.*, 982 N.Y.S.2d 746 (1st Dep't 2014).

The parties' arguments as to whether the continuous violation doctrine applies are as

follows. Defendants note that a failure to promote a person to a vacancy or to a new title is

ordinarily, by its nature, a discrete, non-continuous, singular act, keyed to a particular moment in

time. The Supreme Court in *Morgan* has so recognized, stating that "[d]iscrete acts such as

termination, *failure to promote*, denial of transfer, or refusal to hire are easy to identify."

*Morgan*, 536 U.S. at 114 (emphasis added); *see also Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d

135, 157 (2d Cir. 2012) ("*Morgan* established that an employer's failure to promote is by its very

nature a discrete act."). As Justice Ginsburg has explained,

> A worker knows immediately if she is denied a promotion or transfer, if she is fired
> or refused employment. And promotions, transfers, hirings, and firings are
> generally public events, known to co-workers. When an employer makes a decision
> of such open and definitive character, an employee can immediately seek out an
> explanation and evaluate it for pretext.

*Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 649 (2007) (Ginsburg, J., dissenting).

And where a decision such as one not to promote a defendant is easily identifiable, open, and

public, an employee is on notice that he has been discriminated against, and the statute of

limitations accordingly begins to run.

Fitchett does not dispute that adverse promotion decisions are often singular events to which the continuous violation doctrine would not apply. His argument is keyed to the distinct context of his experience. He argues that the continuing violation doctrine applies, given what the SAC alleges was an ongoing and uninterrupted course of discriminatory treatment towards him. *See* SAC ¶ 94. As alleged in the SAC, the NYPD Intelligence Bureau's promotion practices are opaque to employees. There are no formal applications for, or formal denials of, promotion. And the NYPD does not reveal to its officers when promotion decisions for the Intelligence Bureau will be made or even inform officers that they are being considered for promotion. *Id.* ¶¶ 79–80. The Intelligence Bureau does hold monthly ceremonies at NYPD headquarters to recognize the recipients of new promotions and announcements of the accomplishment are submitted to all commands within the NYPD. *Id.* ¶ 83. Fitchett thus each month presumably became aware that he would, yet again, retain his current title. But, as pled, he did not know when, or even whether, he had been considered that month, or even when or how regularly Intelligence Bureau promotion decisions were being made. *Id.* ¶ 79. In other words, as alleged, the promotion process of which Fitchett complains contrasts with the paradigmatic one in which a plaintiff applies for a unique vacancy, is not selected, and is then notified that a competitor was selected.

The question here is a close one. Adverse promotion decisions ordinarily are unitary acts, as *Morgan* recognizes. But, significant here, the SAC pleads that Fitchett was not notified at any discrete time either that he was up for promotion or that an affirmative decision had been made not to promote him. *Cf. Taylor v. City of New York*, 207 F. Supp. 3d 293, 298 (S.D.N.Y. 2016) (no continuing violation when plaintiff made "numerous inquiries related to the possibility of a promotion" and was told by supervisors on discrete occasions that she could not be

promoted). On a motion to dismiss, the Court must accept the pled facts as true. On the basis of the SAC, it is plausible, in effect, that Fitchett was continuously overlooked—that a conscious and discrete decision not to promote Fitchett did not actually occur, such that, whether for discriminatory reasons or otherwise, he was never considered for promotion or notified that he was up for promotion but had been denied. The SAC plausibly depicts the promotion process to which Fitchett was subject as such a black box that Fitchett did not know whether he was denied a promotion repeatedly, monthly, on several occasions, or never, but only that the desired promotion that he saw comparators attain repeatedly failed to come his way.

Discovery will clarify these matters. It may fail to support the portrait in the SAC. But, given the facts pled, it is plausible that discovery will reveal facts justifying application of the continuing violation doctrine. It is plausible that defendants' failure to promote Fitchett will be shown not to trace to discrete time-bound acts or decisions but a seamless process over time of ignoring him and shunting his candidacy aside based on racial animus. Drawing all reasonable inferences in Fitchett's favor, the SAC plausibly alleges that defendants, on account of Fitchett's race, engaged in a pattern and practice of continuously not considering him for promotion on account of his race. *See EEOC v. UPS, Inc.*, 15 CV 4141 (MKB), 2017 WL 9482105, at *15 (E.D.N.Y. Mar. 9, 2017) ("Many courts have found such a decision as to whether a plaintiff's claims constitute a continuing violation an issue that should be determined by a trier of fact."); *see also Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("Because the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." (internal quotation marks and citations omitted)); *Goodwine v. City of New York*, No. 15 Civ.

2868 (JMF), 2016 WL 3017398, at *5 (S.D.N.Y. May 23, 2016) (declining to resolve continuing violation doctrine at motion to dismiss stage where statute of limitations issue insufficiently clear on the face of the complaint).

The Court therefore declines to hold, at this stage, that the continuing violation doctrine is, necessarily, unavailable to Fitchett, and denies defendants' partial motion to dismiss on this basis. Defendants will be at liberty, at summary judgment and/or at trial, to renew this argument, based on the evidence adduced in discovery. Accordingly, to the extent that the SAC's Title VII claim alleges that defendants failed to promote Fitchett between 2014 (when he began work at the EPU) and May 31, 2017 (300 days before the filing of his EEOC charge) the events during this period remain in play. Similarly, the Court holds, Fitchett has plausibly pled a single, ongoing pattern of unlawful conduct, including conduct outside the three-year statute of limitations period under the Human Rights Laws.

The Court's holding that it is premature to resolve whether a statutory time bar limits Fitchett's claims under these statutes, or whether his otherwise untimely claims are saved by the continuing violation doctrine, applies to all of Fitchett's claims of racial discrimination under these statutes, whether cast as discriminatory treatment or hostile work environment claims. That is because, as pled, these claims are interwoven and turn on substantially the same conduct. The Court expects that discovery will permit a more nuanced assessment and will illuminate whether, in fact, the continuing violation doctrine applies to all, none, or some of these claims.

The Court accordingly denies defendants' motion to dismiss to the extent it is based on statutes of limitation, because, on the pleadings, it is plausible that the continuing violation will be held to apply.

## 2.    **Exhausting Administrative Remedies**

"A Title VII claimant may bring suit in federal court only if he has filed a timely complaint with the EEOC and obtained a right-to-sue letter." *Shah v. New York State Dep't of Civ. Serv.*, 168 F.3d 610, 613 (2d Cir. 1999); *see also* 42 U.S.C. §§ 2000e–5(e) and (f).  Such an exhaustion requirement "is designed to give the administrative agency the opportunity to investigate, mediate, and take remedial action." *Shah*, 168 F.3d at 614 (quotation marks and citation omitted).  Important here, claims not alleged in an EEOC charge may still be brought in a subsequent federal court action provided they are "'reasonably related' to those that were filed with the agency." *Id.* (citations omitted); *see also Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 83 (2d Cir. 2001) (finding that "a plaintiff typically may raise in a district court complaint only those claims that either were included in or are 'reasonably related to' the allegations contained in her EEOC charge" (citation omitted)).  Such subsequent claims are considered reasonably related to conduct alleged in an EEOC charge when: "(1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (internal quotation marks and citation omitted).

Here, defendants move to dismiss the SAC's claims to the extent that Fitchett did not raise such claims in his EEOC charge.  Specifically, defendants note that the SAC alleges that defendants' promotional policies or practices have had a disparate impact on Fitchett's protected class within the NYPD.  Defendants argue that Fitchett's EEOC charge did not allege this, but instead only made disparate treatment allegations specific to him.

To the extent the SAC makes allegations sounding in disparate impact theories of discrimination, defendants are wrong to claim these were not prefigured in Fitchett's EEOC

16

charge. Fitchett wrote there: "Based on my workplace experience, the NYPD is culpable, in my case, of a pattern and practice of race discrimination and hostile work environment." Saint-Fort Decl. Ex. 1 ("EEOC Charge") at 2. Citing the lesser experience and performance records of his non-African American comparators who had been promoted, Fitchett also wrote, "I have not been promoted because of my race." *Id.* To be sure, the bulk of the EEOC charge details Fitchett's individualized allegations against individual NYPD officials, now the individual defendants in this case. But Fitchett's EEOC charge also clearly alleges a "pattern and practice of race discrimination" in the NYPD. *Id.* Specifically, Fitchett's EEOC allegations track two of the potential *Alfano* factors, so as to preserve his current claims. Fitchett alleges in his EEOC charge that his lack of promotion was due to a "pattern and practice" of racial discrimination, and an EEOC investigation into that claim would reasonably include, within its scope, the promotion policies or practices of the NYPD Intelligence Bureau. And the SAC alleges that Fitchett suffered retaliation for filing the EEOC charge itself, namely, that he was transferred to the DPU, along with other detectives who had brought EEOC charges and federal court claims against the EPU, and as a result was denied seniority and opportunity for promotion.

The Court therefore denies defendants' motion to dismiss to the extent based on a failure to exhaust administrative remedies.

**B.    Defendants' Substantive Arguments**

**1.    Fitchett's Disparate Treatment Claims**

Defendants argue that the SAC does not plead a *prima facie* case of disparate treatment discrimination, as required by cases applying the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), framework to such claims.

To make a *prima facie* case of discrimination, "a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an

17

adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010); *see also McDonnell Douglas*, 411 U.S. at 802. This framework applies to claims of disparate treatment under Title VII and the Human Rights Laws. *See Ferrante v. Am. Lung Ass'n*, 90 N.Y.2d 623, 629 (1997) (same analysis applies for NYSHRL claims as "[t]he standards for recovery under section 296 of the Executive Law are in accord with the Federal standards under Title VII of the Civil Rights Act of 1964" (internal citations omitted)); *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27 (1st Dep't 2012) (noting applicability of *McDonnell Douglas* framework in analyzing discrimination claims under NYCHRL).

Defendants argue that the SAC fails to plausibly allege sufficient facts to satisfy prongs three and four of the *McDonnell Douglas* framework: that there was an adverse employment action, and that it occurred under circumstances giving rise to an inference of racial discrimination.

"Employment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.'" *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations omitted)). Nevertheless, changes in working conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640 (internal quotation marks and citation omitted). "Everyday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions." *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x

206, 211 (2d Cir. 2010). Even under the NYCHRL, which imposes more permissive pleading standards for discriminatory treatment actions, "petty slights or trivial inconveniences . . . are not actionable." *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (1st Dep't 2009); *see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (to establish claim under NYCHRL, plaintiff need only demonstrate "that she has been treated less well than other employees" because of her protected characteristic).

Defendants are correct that much conduct alleged in the SAC is not more serious than petty slights, trivial inconveniences, or minor alterations of Fitchett's job responsibilities. *See* Def. Mem. at 13, 22. Fitchett's assignment to work the City Hall back gate, his assignment to work overtime shifts in cold weather, and his assignments to work at Gracie Mansion are not plausibly viewed as diminishing his material responsibilities. They did not significantly diminish his salary, responsibilities, or material benefits—they merely reflected a change in his duties—and therefore do not amount to an adverse employment action. Similarly, Fitchett's allegation that he was denied full meal breaks does not arise to an adverse employment action. *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 497–98 (S.D.N.Y. 2010) (denials of certain breaks to plaintiff "[did] not amount to adverse employment actions because they do not constitute materially adverse changes in the terms, conditions or privileges of her employment").

The Court further agrees with defendants that, as to prong four of the showing made for a prima facie case under *McDonnell Douglas*, the SAC does not plausibly establish that Fitchett's unfavorable work assignments were made as a result of his membership in a protected class. *See Harris v. NYU Langone Med. Ctr.*, No. 12 Civ. 0454 (RA) (JLC), 2013 WL 3487032, at *14 (S.D.N.Y. July 9, 2013) ("[T]he plaintiff's claim must offer more than conclusory statements and the complaint must contain factual allegations supporting the plausible inference that the

employer discriminated against the plaintiff *because* of the plaintiff's protected characteristic." (internal quotation marks and citation omitted)). Although the SAC alleges that "[n]o non-African American EPU detectives" were assigned these shifts and given these breaks, SAC ¶¶ 53, 55, it does not supply more than conclusory allegations that these assignments were on account of Fitchett's race.

The Court also agrees with defendants that, as to Fitchett's transfer to the DPU, the facts alleged in the SAC do not indicate that this reassignment represented a demotion, gave him a less distinguished title, or occasioned a material loss of benefits. *See Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 504 (S.D.N.Y. 2013) (lateral transfers and subjective dissatisfaction with work assignments and schedules did not amount to an adverse employment action). Finally, as to Fitchett's not having received training opportunities to which 20 out of 30 members of his unit had access, the SAC does not allege at all, let alone non-conclusorily, that race played a role in determining which 10 officers were denied such opportunities. The Court therefore does not find these employment actions actionable.

The SAC's non-promotion allegations are, however, different. As to Fitchett's delayed promotion to Detective Third Grade, defendants concede that a failure to promote would qualify as an adverse employment action. But, defendants argue, inasmuch as Fitchett was eventually promoted, a delayed promotion is not an adverse employment action. And, they note, Fitchett has not identified concrete promotions he was thereafter denied.

The assembled case law reflects divergent outcomes in cases where a promotion has been obtained but only after a delay allegedly driven by discrimination. *Compare Jeffrey v. Montefiore Med. Ctr.*, No. 11 Civ. 6400 (RA), 2013 WL 5434635, at *20 (S.D.N.Y. Sept. 27, 2013) ("[I]t is a *failure* to promote, not a failure to *quickly* promote that makes an employment

action materially adverse.") *and Davis v. City Univ. of N.Y.*, No. 94 Civ. 7277 (SHS), 1996 WL 243256, at *9 (S.D.N.Y. May 9, 1996) ("The eventual grant of tenure and a promotion to [plaintiff], even if after a delay, and even if that delay were due to discrimination or retaliation, contradicts her claim that she suffered a materially adverse change.") *with Tierney v. City of New York*, No. 02 Civ. 2403 (RWS), 2007 WL 895133, at *24 (S.D.N.Y. 2007) (delay in promotion constituted an actionable adverse employment action under Title VII); *Guinyard v. City of New York*, 800 F. Supp. 1083, 1088–89 (E.D.N.Y. 1992) ("[A] delay in promotion may itself result in injury . . . . Even for those who were promoted, an illegal delay in promotion may still result in lost wages, benefits, and other types of injuries.").

At the motion to dismiss stage, the Court finds that Fitchett has met his *prima facie* burden. Viewing the facts in the light most favorable to Fitchett, the delay in his promotion was well more than fleeting. He was not promoted until 10 months after other, less exemplary, non-African American detectives in his unit had been promoted. Significant too, as alleged, the NYPD backdated his promotion to Detective Third Grade to December 25, 2015. The meaning of this is unclear from the SAC, including whether this determination reflects an admission that a promotion had been due Fitchett in December 2015. If so, Fitchett's promotion might be deemed more than three and a half years late. The facts pled adequately plead an adverse employment action.

The Court further finds that the SAC pleads sufficient facts to satisfy the fourth element of a *prima facie* case—that the adverse action took place under circumstances giving rise to an inference of discrimination. A "complaint must contain factual allegations supporting the plausible inference that the employer discriminated against the plaintiff *because of* the plaintiff's protected characteristic." *Edwards v. N.Y. State Unified Court Sys.*, No. 12 Civ. 46 (WHP), 2012

WL 6101984, at *4 (S.D.N.Y. Nov. 20, 2012). Here, although some comments allegedly made to Fitchett do not suggest a racial motivation, other facts pled make a discriminatory motive plausible. The SAC identifies three non-African American officers in the EPU who were promoted to Detective Third Grade 10 months sooner than Fitchett, notwithstanding their lesser experience and less exemplary service records. The SAC also alleges that two non-African American detectives, but none of the qualified African American detectives, were promoted to Detective First Grade during Fitchett's tenure. *See Graham v. Long Island Rail Road*, 230 F.3d 34, 43 (2d Cir. 2000) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for racial discrimination."); *Fahmy v. Duane Reade, Inc.*, No. 04 Civ. 1798 (DLC), 2006 WL 1582084, at *8 n.11 (S.D.N.Y. June 9, 2006) ("Although the absence of objective criteria does not, without more, show discriminatory intent . . . [an employer's] inability to demonstrate that it relies only on race-neutral factors in making promotions leaves it more vulnerable to charges of discrimination.").

Further support for Fitchett's claim of a racial motivation in the EPU comes from the 2016 EEOC investigation of the NYPD's Intelligence Bureau, cited in the SAC. As pled, that investigation found that black Intelligence Bureau detectives did not receive equal treatment in promotion and received lesser and later promotional opportunities given their qualifications. These findings of apparently racially discriminatory practices close in time make more plausible Fitchett's claim that the longstanding failure to promote him was traceable to racial bias in the same unit. The SAC's allegations of retaliatory transfers of multiple officers who had brought

22

EEOC charges and lawsuits challenging the Intelligence Bureau's employment practices also adds plausibility to the claim of an improper, discriminatory animus.

The Court holds that the SAC plausibly alleges that adverse employment actions were taken towards Fitchett on account of race and accordingly denies defendants' motion to dismiss Fitchett's disparate treatment claims.

### 2.    Fitchett's Hostile Work Environment Claims

Defendants next move to dismiss Fitchett's hostile work environment claims.

To establish a hostile work environment claim under either Title VII or under New York law, plaintiffs must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano*, 294 F.3d at 373 (internal quotation marks and citations omitted). "The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." *Id.* (citation omitted). Unlike pervasive harassment, "[i]solated, minor acts or occasional episodes do not warrant relief." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999). This test has both objective and subjective elements. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Id.* at 21–22.

Courts evaluate whether an environment is "hostile" or "abusive" by examining the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance." *Id.* at 23. To prevail, a plaintiff

must demonstrate either that a single incident was extraordinarily severe, or that a series of

incidents were "sufficiently continuous and in order to be deemed pervasive." *Perry v. Ethan*

*Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal quotation marks and citations omitted)).

Finally, "a plaintiff must also demonstrate that she was subjected to the hostility because of her

membership in a protected class." *Brennan*, 192 F.3d at 318.

    The SAC's allegations of hostility here are sparse. Apart from Fitchett's allegedly having

received inferior work assignments, they are that (1) Insp. Redmond, on one occasion, sent an

email allegedly intended to mock Fitchett to the other officers in his unit; (2) Sgt. Briscoe told

Fitchett, on one occasion, that he had received a certain work assignment because he was an "an

extra person"; and (3) Sgt. Briscoe, on other occasions, told Fitchett he was not to leave or go to

the bathroom without checking in with his supervisor.

    These allegations are not sufficient to provide an objectively reasonable basis on which a

jury could find a hostile work environment. Even viewing them in totality, they do not describe

severe or pervasive harassment. These sporadic, isolated incidents do not evince a broader

atmosphere of hostility or abuse. Nor does Fitchett's allegation that he was assigned to less

desirable shifts, including cold-weather shifts, salvage these claims. Measured against the

standards set in reported cases, the environment in which Fitchett worked, as alleged, was not

"so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and

conditions of [his] employment were thereby altered." *Alfano*, 294 F.3d at 373; *see, e.g., Mack*

*v. Port Auth. of N.Y. & N.J.*, 225 F. Supp. 2d 376, 388–89 (S.D.N.Y 2002) (finding allegations

that supervisor called plaintiff a "boy," petty criticisms of nonwhite workers and disparate work

assignment, and disparate enforcement of lunch and break limitations inadequate for race-based hostile work environment claim); *cf. Whidbee v. Garzarelli Foods Specialties, Inc.*, 223 F.3d 62, 70–71 (2d Cir. 2000) ("[A] stream of racially offensive comments over the span of two to three months" including a physically threatening comment where the defendant "said he had a rope with which to hang a co-worker . . . . sufficient evidence of a hostile work environment to survive summary judgment."); *Snell v. Suffolk Cty.*, 782 F.2d 1094, 1098 (2d Cir. 1986) (daily use of racial epithets and "proliferation of racially derogatory "literature" posted on bulletin board and walls throughout main thoroughfares," as well as confronting minority officers with "cartoons and 'doctored' photographs favorably portraying the Ku Klux Klan, offensive photographs of half-naked black men and women in African garb, a picture of a black man with a noose around his neck" sufficiently severe and pervasive to merit finding of hostile work environment); *Williams v. N.Y.C. Hous. Auth.*, 154 F. Supp. 2d 820, 823 (S.D.N.Y 2001) (display of a noose in supervisors' office for several days until asked by African American workers to remove it sufficiently severe to plead a hostile work environment claim).

The Court therefore grants defendants motion to dismiss Fitchett's hostile work environment claims.

### C.      Fitchett's Claims Against Individual Defendants

Defendants argue that, because the SAC does not make any concrete allegations to the effect that Lt. Pfeffer was personally involved in any allegedly actionable conduct, the claims against him—all brought under the Human Rights Laws—should be dismissed. Defendants further argue that the NYPD is not a suable entity and that claims against it should also be dismissed.

As to Lt. Pfeffer, "individual defendants may be liable under the NYSHRL and the NYCHRL if plaintiff can demonstrate that the defendant 'actually participate[d] in the conduct

giving rise to discrimination.'" *Anyachebelu v. Brooklyn Hosp. Ctr.*, No. 16 CV 3159 (DLI) (VMS), 2017 WL 9511073, at *20 (E.D.N.Y. July 20, 2017) (quoting *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687–688 (S.D.N.Y. 2012)). The SAC does not plead any facts indicative of actual participation by Lt. Pfeffer in any of the alleged discriminatory conduct. Nor does it allege that Lt. Pfeffer had the power to make promotion decisions. The SAC therefore does not state a claim against Lt. Pfeffer. The Court dismisses the claims against him.

As to the NYPD, defendants are correct that the NYPD is an entity not subject to suit. New York Law provides that, "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y.C. Charter Ch. 17 § 396; *see also Jenkins v. City of New York*, 478 F.3d 76, 93 n. 19 (2d Cir. 2007) (affirming dismissal of claims against the NYPD as a non-suable entity). Accordingly, the Court dismisses the claims against the NYPD.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss Fitchett's claims against Lt. Pfeffer and the NYPD, and his hostile work environment claims. These dismissals are with prejudice, as the Court has allowed Fitchett to amend his Complaint twice in response to motions to dismiss. There is no articulated basis to afford him another opportunity to amend.

The Court denies defendants' motion on Fitchett's remaining claims. This leaves Fitchett's disparate treatment claim under Title VII and his disparate treatment, failure to promote, and unlawful discrimination claims under the Human Rights Laws. The Court respectfully directs the Clerk of Court to terminate the motions pending at Dkts. 23, 29, and 42,

and to remove Lt. Pfeffer and the New York City Police Department from the caption of this case.

The remaining parties are directed to file a case management plan providing for prompt discovery on the remaining claims, in accordance with the Court's individual rules, within 14 days of the date of the Order.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 30, 2019
New York, New York